# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

LYCOS, INC.,

        Plaintiff,

    v.

TIVO, INC.,
NETFLIX, INC., and
BLOCKBUSTER, INC.

        Defendants.

CIVIL ACTION NO. 1:07cv11469 MLW

## DECLARATION OF DR. PAUL RESNICK, Ph.D., IN SUPPORT OF DEFENDANT NETFLIX INC.'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT BASED ON LIMITED ISSUES

I, Paul Resnick, Ph.D., declare as follows:

## I.   __INTRODUCTION__

1.       I make this declaration in support of Defendant Netflix, Inc.'s Motion for Summary Judgment of Noninfringement Based on Limited Issues.  I have personal knowledge of the facts stated herein and if called upon, could and would competently testify thereto.

2.       I have been retained by defendant Netflix, Inc. ("Netflix") as an expert in this case to provide my opinions with respect to U.S. Patents Nos. 5,867,799 (the " '799 Patent"), and 5,983,214 (the " '214 Patent").  Collectively I refer to these patents in this declaration as the "Patents-in-suit."  Consistent with the "Field of Invention" specified in the patents, in my opinion these patents relate to the field of information filtering.

### Personal Background

3.       Attached hereto as **Exhibit 1** is a true and correct copy of my curriculum vitae.  I have a Ph.D. and a Masters degree in Computer Science from M.I.T.  I currently am a Professor in the School of Information at the University of Michigan.  Before joining the University of Michigan, I was a senior member of the technical staff at Bell Laboratories and AT&T Laboratories where my research focused on information filtering, Internet technologies, and their policy implications. Before that, I was an Assistant Professor at MIT's Sloan School of Management, where my work focused on the development of collaborative filtering systems.

4.       During my professional career, I have worked extensively with information filtering and retrieval systems (sometimes called "personalization" systems), particularly those for use on the Internet and in online communities.  In the early 1990s, I co-led an effort to design and create one of the first collaborative filtering systems for Internet use — GroupLens — presented at the October 1994 A.C.M. Conference on Computer Supported Cooperative Work.

5.      GroupLens often is cited as pioneering work in the field of collaborative filtering.  Its underlying algorithmic approaches were adopted widely and formed the basis for other research throughout the field.  Publications on GroupLens are cited routinely as foundational for the field.  The technology also launched the company NetPerceptions whose software products were used by many Web merchants to recommend products.

6.      As the World Wide Web grew in popularity, the press and software vendors consulted me as an analyst and expert on the selection and filtering of Web content and on Web communities.  Publications ranging from Scientific American to Communications of the ACM to Wired have published my articles and Network Computing Magazine named me among its 25 Network Technology Drivers in 1996.  During that year, I co-led a workshop on collaborative filtering where we coined the term "Recommender Systems" that currently describes the field.  A special section of Communications of the ACM that I co-edited was published in 1997 to report on the developments in Recommender Systems.

7.      I co-led a working group of the World Wide Web Consortium — the standards organization for the Web — to establish a platform for Internet information selection which could not only provide an open mechanism for moderating access to objectionable web pages and sites, but also more generally could provide for distributed rating and labeling of information.  More recently, I have led research focused on analyzing and designing reputation systems that help maintain trust in on-line communities.

**Summary of My Review of the Patents-in-Suit**

8.      I have reviewed the Patents-in-suit and their corresponding prosecution histories.  I am familiar with the '799, and '214 Patents generally, and specifically with claims 71, 74, 94, 95, 124, 125, 127, 128, and 129 of the '799 Patent and claims 1, 10, and 17 of the '214 Patent, which I understand are the claims being asserted.

9.      I have been informed of Netflix's proposed constructions for certain claim terms and have been asked to provide my expert opinion as to whether those constructions are consistent with the understanding of a person of ordinary skill in the field of information filtering as of the filing of these patents, in 1996.

10.      In this declaration, I first provide a technical background of the art to which the Patents-in-suit relate.  I then provide a description of the technology and terminology covered by these patents.  I conclude by providing my opinions as to the constructions Netflix proposes for certain claim terms.

## II.      BACKGROUND OF THE TECHNOLOGY

11.      The Patents-in-suit relate to the general field of customized filtering of information, such as news articles, audio or video clips, or the like, from a network that has multiple sources, such as the thousands of websites that began to make up the World Wide Web.  At the time these patents were filed, this was not a new field; there was a long history of personalized information filtering systems and publications describing the general approaches the patents describe: content-based and collaborative filtering.

### A.  Information Filtering

12.      While it has gone by various names over the development of the field, an "information filtering" system generally aims to present to the user the information he or she desires, addressing the problem of there being too much information for a user to consider on an item-by-item basis.  A 1958 article by H.P. Luhn[1] is cited frequently as a primary early work introducing basic ideas in the field.  Luhn's system was designed to automatically distribute new information

---

[1]      H.P. Luhn, *A business intelligence system*, IBM Journal of Research and Development, 2(4): 314-319 (October 1958).  A true and correct copy of Luhn's article is attached hereto as Exhibit 2.

Decl. of Dr. Paul Resnick ISO Netflix's
Mtn. for Summary Judgment of Noninfringment
Case No. 1:07cv11469 MLW

3

of interest to users (or groups of users[2]) in an organization based on "interest profiles." Documents, such as letters, papers, reports, or books were automatically analyzed and abstracted to a concise summary. When new documents arrived, they were compared to the interest profiles and a numerical degree of similarity was determined. For documents that closely matched an interest profile, i.e., had a high enough similarity to the interest profile, brief information was provided and then, if requested, an automatically created abstract was also made available. If, after consulting the abstract, the underlying document was requested, the system deemed the document to have been "accepted" and provided the full text. Luhn's system monitored which documents were accepted and then automatically updated the interest profile based on the contents of the accepted documents. This allowed the system to adapt to reflect the current interests of its users.[3] After Luhn's article, many similar systems were commercialized during the 1960s — then generally referred to as "selective dissemination of information" — and the field continued to develop, in part, in parallel with the related field of information retrieval, I discuss below.

13.    The term "Information Retrieval" generally refers to selecting items from an already assembled collection rather than selecting items from an incoming stream, but the same basic techniques were used in systems designed for either purpose.[4] In common parlance today, information retrieval systems often are called "search engines." By the early 1990s, information

---

[2]    Luhn refers to them as "action points."

[3]    Luhn's system also adapted to reflect users' current interests by gradually decaying the effects of past acceptances. Parts of an interest profile added after an older acceptance required a higher degree of similarity with a new document in order for the document to be disseminated.

[4]    Although a system designer faces some distinct challenges in identifying people who will like a new item (selective dissemination of information) as opposed to identifying items from a collection that a single person will like (information retrieval), the basic challenge for either type of system is to predict how well users will like items.

retrieval was an extensively researched and mature field.[5]  Systems that used information

retrieval techniques were in widespread use.  Examples included the LEXIS/NEXIS system for

searching databases of legal and news documents and early Internet search engines.[6]

14.     By the early 1990s, the term "information filtering" was widely used to describe systems

that helped direct people to some information items and away from others.  The word "filtering"

evokes separating unwanted items from a stream, while "retrieval" evokes selecting wanted

items from a known collection.  In implementing computer systems, however, the distinction

makes little difference; in either case, a set of potential items is divided into those that are wanted

and those are not.  A widely read paper by Belkin and Croft from December 1992, titled

"Information filtering and information retrieval:  two sides of the same coin?" highlights the

similarities in the basic techniques of information filtering and retrieval systems.[7]

15.     Because of the similarities in these basic techniques, those in the field were generally

aware of the applicability of these basic techniques to both areas.  I will generally refer to the

field as information filtering in the remainder of this Declaration. Those in the field knew that

techniques from the systems and literature of information retrieval could be applied in the

context of information filtering.  Those technologies had evolved for decades. For example,

Salton and McGill's 1983 book, *Modern Information Retrieval*, details systems supporting basic

ideas in the Patents-in-suit such as content profiles, updating or relevance feedback, and their use

to give a user documents of interest.

---

[5]      *See, e.g.*, Gerard Salton and Michael McGill, *Introduction to Modern Information Retrieval*,
McGraw-Hill (1983).

[6]      *See, e.g.*, Margaret St. Pierre, *Wide Area Information Servers (WAIS)*, ConneXions, The
Interoperability Report, WAIS Incorporated (February 1994).

[7]      Nicholas Belkin and W. Bruce Croft, *Information filtering and information retrieval:  two sides
of the same coin?*, Comm. ACM, Vol. 35, No. 12, p. 29-38 (December 1992).  A true and correct copy is
attached hereto as Exhibit 3.

### B.  Different approaches to information filtering

16.     Two main approaches to information filtering dominated the field prior to the Patents-in-suit: content-based filtering and collaborative filtering.  An influential 1987 article by Thomas Malone, et al. entitled "Intelligent Information Sharing Systems" distinguished three types of information filtering systems:  cognitive, social, and economic; and these distinctions generally have persisted to this day.  The first type, "cognitive," works by characterizing the contents of an item, e.g. message or document, and the information needs of potential recipients, and then uses these representations to select or reject items.  Over time, Malone's first type became known in the field as "content-based" information filtering, reflecting the way in which it was implemented in practice—through representations of the contents of items such as words appearing in a document or whether a movie's genre is "action" or "comedy."  The second type, "social," is described as working based on relationships between users in a community.  Over time, it became almost synonymous with its most successful method—collaborative filtering— which "automates the process of 'word-of-mouth' recommendations."[8]  The third type, economic, relied on various kinds of cost-benefit assessments and explicit or implicit pricing mechanisms.  It did not immediately spawn a subfield, although it continues to be the basis for research on topics such as limiting email spam.

17.     In the context of filtering articles the basic premise of collaborative filtering is that "people who agreed in their subjective evaluation of past articles are likely to agree again in the future."[9]  This same premise is generally applicable to other contexts.  In general, two people are

---

[8]      Upendra Shardanand and Pattie Maes, *Social Information Filtering: Algorithm for Automating "Word of Mouth,"* In Human Factors in Computing Systems CHI '95 Conference Proceedings, pages 210--217, 1995, at page 210.

[9]      Resnick, P., Iacovou, N., Sushak, M., Bergstrom, P., and Riedl, J. *GroupLens: An open architecture for collaborative filtering of netnews*. Proceedings of the 1994 Computer Supported Collaborative Work Conference (1994) at p. 176. (Ribera Decl., Ex. 2, Tab 4)

considered to have similar tastes if they liked the same items. Two items are considered similar in desirability if they are liked by the same people. In a collaborative filter, items are recommended because they are liked by users with similar tastes, or because they are similar in desirability to items a user has liked in the past. This contrasts with content-based filters, which recommend items because they are similar in content to a profile representing the user's preferences for content.

18. By the mid 1990s, those in the field commonly referred to Malone's "cognitive" approach as "content-based" approaches to information filtering and retrieval and distinguished them from "collaborative" or "social" filtering[10].

19. By the mid 1990s, the notion that combining these two approaches would be valuable was suggested by the literature. For example, in a 1992 article that describes a system called Tapestry, generally regarded as having given rise to the term "collaborative filtering," the authors state:

> Several mail systems support filtering based on a document's contents . . . . A basic tenet of the Tapestry work is that more effective filtering can be done by involving humans in the filtering process. [¶] In addition to content-based filtering, the Tapestry system was designed and built to support *collaborative*

---

[10] *See, e.g.* Dumais et al., *Using Latent Semantic Analysis to Improve Access to Textual Information*," Proceedings of the SIGCHI conference on Human factors in computing systems (1988) p. 281 – 285, at 281 (referring to "Keyword or content-based retrieval systems"); Mitesh Suchak, *GoodNews: A Collaborative Filter for Network News*, M.I.T. Department of Electrical Engineering and Computer Science (February 1994) at 7 ("These approaches share one thing in common, they all use the 'content' of the information for classification, filtering or retrieval. An alternative to content-based selection is to select information based on 'who' has composed or recommended it."); David Maltz, *Distributing Information for Collaborative Filtering on Usenet Net News*, M.I.T. Department of Electrical Engineering and Computer Science (May 1994) at 13–14 ("Most present filtering systems are examples of what Malone has termed a cognitive filter. These filters attempt to select articles for a user to view by determining the value of the information contained in the article to the user.") (citation omitted).

*filtering.*[11]

In a 1994 thesis by MIT student Upendra Shardanand[12] describing a later social (collaborative) filtering system for music, integration was suggested:

> Integration with Content Based Filtering:  Both Content-Based Filtering and Social Information Filtering have their strengths and weaknesses . . . [T]he two processes are complementary in human practice.  In computer applications the two approaches may also be used in conjunction for greater effect.  So far the two approaches have been implemented separately but soon the integration of the two will need to be explored.

In industry, systems combining the techniques had already been implemented.  *See*, U.S. Patent No. 5,724,567 (filed April 25, 1994) to Dr. Daniel Rose, *et al*. at Apple Computer.  Elsewhere, other researchers were pursuing similar goals.  *See, e.g.,* U.S. Patent. No. 5,754,939 (filed October 31, 1995) to Frederick Herz, Jason Eisner *et al*.

20.    This terminology of content-based and collaborative filtering was quickly adopted in the field and still today is widely used.  Since its early introduction, the literature in the information retrieval field generally supports the understanding that content-based filtering, as distinct from collaborative filtering, relies on content profiles that describe the contents of the items being filtered.[13]

---

[11]    David Goldberg, et al., *Using Collaborative Filtering to Weave an Information Tapestry*, Comm. ACM, Vol. 25, No. 12 at p. 61 (1992).  (Ribera Decl., Ex. 2, Tab 5).  *See, also,* Terry, *A Tour Through Tapestry*, Proceedings of the conference on Organizational computing systems (1993) pp. 21-29, at p.21 ("The Information Tapestry is an experimental system that employs both collaborative filtering and content-based filtering, as well as automatic appraising and highlighting, to tailor the delivery and presentation of information to each user's personal interests.")

[12] Unpendra Shardanand, *Social Information Filtering for Music Recommendation* at 78 (September 1994).

[13] *See, e.g.*, Claypool, et al., *Combining Content-Based and Collaborative Filters in an Online Newspaper*, ACM SIGIR Workshop on Recommender Systems – Implementation and Evaluation, (August 1999), at p.2 (stating that "[a] pure content-based filter recommends items based solely on a profile built up by analyzing the content of items that a user has rated."); Melville, et al., *Content-Boosted Collaborative Filtering*, Proceedings of the SIGIR-2001 Workshop on Recommender Systems (September, 2001), p. 1 ("content-based methods provide recommendations by comparing representations of content contained in an item to representations of content that interests the user.").

1.  Content-based information filtering techniques

21.    The paper by Belkin and Croft provides a diagram, reproduced below, that describes the

elements of a content-based information filtering system for text documents. The elements

include: (1) representation of the information interests of users as profiles; (2) representations of

the contents of documents (text surrogates in the diagram); (3) comparison of the document

representation with the interest profiles, resulting in some documents being brought to the user's

attention; (4) these texts can then be used or evaluated by the user, and, depending on whether

they were liked or disliked, (5) his or her interest profile may be modified to provide more or

fewer document of the type that were previously either liked or disliked.[14]  Belkin and Croft

illustrate the process with the following figure.



22.    The techniques for content-based information filtering primarily draw from the field of

information retrieval.[15]  The most influential—and prototypical—content-based information

---

[14]      *Belkin and Croft*. at 30-32 (Exhibit 3).

[15]      As I note above, it has been widely-recognized in the field that the two application areas are
fundamentally related.  *See id.*

retrieval system was Cornell's SMART system. SMART grew out of research of Gerard Salton and his colleagues, and his texts on information retrieval are among the most frequently cited in the field.[16]

23.    The SMART system established the "vector space model" as the dominant approach to information retrieval and filtering. An item profile or user interest profile is represented as a vector (a set) of numeric weights, each weight corresponding to some characteristic. A higher numeric weight in an item profile means the corresponding characteristic applies to the item to a greater degree. In a user profile, a higher numeric weight means the user prefers items that have higher weight for the corresponding characteristic.

24.    When the information items are text documents such as news articles or product descriptions, terms (words and multi-word phrases) extracted from the documents are the characteristics used as a basis for vector space representations, as described by Salton.[17] Not every term need be a characteristic. Common words (e.g. "the" and "and") that do not provide descriptive representations of content for any particular concept may be excluded. The weight for a term is computed in one of several ways, taking into account not only its frequency of occurrence in the document but possibly also its position and whether it is a term that does not appear often in other documents (in which case it is a distinguishing characteristic of the current document and should get higher weight).

25.    The '799 and '214 Patents describe the vector space model to construct item profiles for information entities (consisting of the information referred to as "Structured Feature Information" and "Unstructured Feature Information" in the patents). *See, e.g.*, '799 Patent, col.

---

[16]    *See, e.g.*, Gerard Salton, ed., *The SMART Retrieval System* (1971). Gerard Salton and Michael McGill, *Introduction to Modern Information Retrieval*, McGraw-Hill (1983).

[17]    *Introduction to Modern Information Retrieval*, at p. 121 (describing the "[b]y 'term' is meant some form of content identifier, such as a word extracted from a document text, a word phrase, or an entry from a term thesaurus.")

21:13-17, col. 22:1-4, Table 4 (below).[18]  Table 4 lists for each article a vector containing the number of times a given "token" occurs in certain articles, along with the user's rating for each article. A token, in this context, means a unit of information in the document, often a word, but it may also mean a phrase or group of words.[19]  The last row of the table shows the total number of times a token appears across all of the articles in the set.

### TABLE 4

| Article | Token 1 | Token 2 | Token 3 | Token 4 | Rating |
|---------|---------|---------|---------|---------|--------|
| 1 | 2 | — | — | — | 5 |
| 2 | 1 | 2 | — | — | 5 |
| 3 | 2 | 2 | 1 | — | 4 |
| 4 | 2 | — | 1 | — | 4 |
| 5 | 1 | — | — | 1 | 1 |
| 6 | 3 | 1 | 3 | 1 | 3 |
| 7 | — | 1 | 3 | 1 | 2 |
| 8 | — | — | 3 | 2 | 2 |
| 9 | — | 2 | — | 2 | 2 |
| 10 | — | — | — | 2 | 1 |
| Frequency | 11 | 8 | 11 | 9 | |

26.    In one method described in Salton, and also described in the Lycos patents, the item profile for a document is computed from the vector of how frequently terms appear in the document, using the Term Frequency-Inverse Document Frequency ("TF/IDF") algorithm. Using TF/IDF, words that appear frequently in a document but not very frequently in a collection of documents are given greater weight as the descriptors for the document.  The rationale of this approach is that words that appear many times in a document but not in others are likely to be

---

[18]    For simplicity, I refer to the '799 Patent specification.  The specifications also describe the use of an approach based on the Minimum Description Length ("MDL") principle.  This approach, while not as common in the field as the Vector Space Model using a cosine similarity metric, also was quantitative and derived a numerical metric for the fit of an "informon" to a rating.  *See* '799 Patent, col. 13:7–15.

[19]    *See* '799 Patent, col. 18:39-47 ("Tokens include punctuation and other specialized symbols that may be part of the structure found in the article headers . . . in addition to typical words such as "seminar" . . . the punctuation mark "$" and the symbol "Newsgroup:comp.ai" are also tokens. Using noun phrases as tokens also can be useful.")

Decl. of Dr. Paul Resnick ISO Netflix's
Mtn. for Summary Judgment of Noninfringment
Case No. 1:07cv11469 MLW

11

descriptive of that document as opposed to being just general terms.  For example, when researching in a database of technical publications, an article on information filtering is likely to have words like profile, similarity, metric, vector, etc.  These words are more descriptive of the content of the paper than more generic terms like abstract, proceedings, journal, conclusions, or the like.  Thus, the representation or profile of that article would highlight the presence of the more unique words.  The TF/IDF methodology accomplishes this by providing a relevance value or "weight" to each word.  The weight is proportional to how frequently each of the words appear in the document and proportional to a measure of how unique the words are with respect to other documents in the relevant set.  Applying the TF/IDF algorithm to the values in Table 4 yields the weighted value of each token in a given article, shown in Table 6 (below).

TABLE 6

| Article | Token 1 | Token 2 | Token 3 | Token 4 |
|---------|---------|---------|---------|---------|
| 1  | 0.18 | 0.00 | 0.00 | 0.00 |
| 2  | 0.09 | 0.25 | 0.00 | 0.00 |
| 3  | 0.18 | 0.25 | 0.09 | 0.00 |
| 4  | 0.18 | 0.00 | 0.09 | 0.00 |
| 5  | 0.09 | 0.00 | 0.00 | 0.11 |
| 6  | 0.27 | 0.13 | 0.27 | 0.11 |
| 7  | 0.00 | 0.13 | 0.27 | 0.11 |
| 8  | 0.00 | 0.00 | 0.27 | 0.22 |
| 9  | 0.00 | 0.25 | 0.00 | 0.22 |
| 10 | 0.00 | 0.00 | 0.00 | 0.22 |
| 11 | 0.27 | 0.00 | 0.00 | 0.00 |
| 12 | 0.09 | 0.00 | 0.09 | 0.44 |
| 13 | 0.00 | 0.63 | 0.45 | 0.00 |
| 14 | 0.00 | 0.00 | 0.00 | 0.00 |

For example, in Article 1, the value for Token 1 is 0.18.  This value is computed by multiplying the Term Frequency ("TF"), which was 2 in Table 4, by the Inverse of Document Frequency ("IDF").  As shown in the last row of Table 4 above, the document frequency was 11 for Token 1.  Thus, the calculation of the weighted value for Token 1 in Article 1 is:

$$TF \cdot IDF = \left( 2 \times \frac{1}{11} \right) = 0.18$$

This calculation can be applied to every token and every article in Table 4 to compute the token values in Table 6.

27.    In the vector space approach, the user profile is represented in a similar way. It is a vector of numeric values, where each number is a weight representing the user's interest in each of the terms or tokens. The terms or tokens of the user profile are the same as those used in item profiles. Below is a table representing the weights for terms in a hypothetical user profile. *See* '799 Patent, col. 23:40-43.

|  | Token 1 | Token 2 | Token 3 | Token 4 |
|---|---|---|---|---|
| Positive | 0.71 | 0.56 | 0.33 | 0.0 |

The weight for token 1 is higher than that for the other tokens, which indicates that the user prefers documents containing Token 1 to documents containing the other tokens. In the patent, the method that is illustrated has what might be considered two user profiles, one with positive weights indicating how much a user likes each token, and a second vector of weights indicating how much a user dislikes each token. For the sake of simplicity, I will only use the positive vector in this explanation.

28.    One way to generate a user's profile is to "learn" it from a training set of items that a user has rated. The patents illustrate one way of doing that learning. The training set contains item profiles for a set of documents, together with the user's ratings of those items, as in Table 4. Intuitively, if the user gave high ratings to items that had high weight for a token, that token will get a high weight in the user profile. For each item, a score for each token is computed as the item's weight for that token multiplied by a number corresponding to the user's rating of the item, taken from the table of values below. *See* '799 Patent, col. 23:25-28.

Decl. of Dr. Paul Resnick ISO Netflix's
Mtn. for Summary Judgment of Noninfringment
Case No. 1:07cv11469 MLW                                          13

| Rating | 5 | 4 | 3 | 2 | 1 |
|--------|-----|-----|-----|-----|-----|
| Weight | 1.0 | 0.9 | 0.4 | 0.1 | 0.0 |

Thus, if the user gives a rating of 4 to an item that has weight 0.5 for Token 1, the product would be: $0.5 \times 0.9 = 0.45$

For Token 1, this product is computed for each item in the training set and the sum of those products becomes the weight for Token 1 in the user's profile. A similar process is carried out for each of the other Tokens. For the training set illustrated in Table 6, the resulting vector of weights for the user's liking of the Tokens is shown below. *See* '799 Patent, col. 23:40-43.

|          | Token 1 | Token 2 | Token 3 | Token 4 |
|----------|---------|---------|---------|---------|
| Positive | 0.71    | 0.56    | 0.33    | 0.0     |

29.     The comparison or filtering step involves comparing item and user profiles and selecting the best matches according to some similarity function. Representing both items and user interests as vectors based on the same set of characteristics allows the use of standard vector mathematics to compare a document to a user profile and generate a similarity score. There were many vector similarity functions known in the literature, all based on some comparison, characteristic by characteristic, of the weights in the item and user profiles.[20]

30.     Using "distance" metrics was one of the most common techniques for selecting the best-matching items for a given user profile. The "cosine" measure of similarity was commonly used. It assigns a score near 1 if two vectors have high weights for the same terms, and a score closer to zero if they have high weights for different terms.[21] This also can be understood as "how far

---

[20]     *See, e.g., Introduction to Modern Information Retrieval*, at 199–204. For a discussion of different mathematical functions or similarity measures generally available and used for comparing profiles see p. 201-203.

[21]     *Introduction to Modern Information Retrieval,* p.121.

Decl. of Dr. Paul Resnick ISO Netflix's          14
Mtn. for Summary Judgment of Noninfringment
Case No. 1:07cv11469 MLW

away" the vectors are in the "vector space," with higher similarity score meaning closer distance. This approach is illustrated in the '799 and '214 Patents.  *See*, '799 Patent, col. 10:48-56. Applying the cosine similarity metric to the weighted token values and user profile above yields the "Positive Similarity" value in the additional column produced below, taken from Table 6 in the patent but not shown above.

| Article | Positive Similarity |
|---------|---------------------|
| 1 | 0.73 |
| 2 | 0.80 |
| 3 | 0.96 |
| 4 | 0.81 |
| 5 | 0.54 |
| 6 | 0.89 |
| 7 | 0.55 |
| 8 | 0.33 |
| 9 | 0.50 |
| 10 | 0.10 |

The vectors for the articles and the profile have a geometric interpretation and they can be understood as two lines starting from the same origin.  The similarity measure is the cosine of the angle between them — the closer they are, the more similar this metric deems them to be.  While the illustration here, taken from the patents, shows similarity scores for articles in the training set, the same approach can be used to compare the item profiles of new articles to the user profile in order to generate similarity scores for new articles.

31.     The patents describe transforming the calculated similarity values for items into rating predictors for articles.  An independent rating predictor, or IRP, represents the rating a user is predicted to give a new article.  It is calculated using the formula below, where (SIM(pos)) refers to positive similarity values above.  *See* '799 Patent, col. 23:54-59.

$$IRP(pos) = 1 + (SIM(pos)) \times 4$$

The purpose of the transformation is to rescale the similarity score (which is between 0 and 1) into a rating predictor, which is between 1 and 5. A similarity of 0 becomes a rating predictor of 1. A similarity of .1 becomes a rating predictor of 3. A similarity of 1 becomes a rating predictor of 5.

Table 5 shows the token counts for four new articles.

TABLE 5

| Article | Token 1 | Token 2 | Token 3 | Token 4 |
|---------|---------|---------|---------|---------|
| 11 | 3 | — | — | — |
| 12 | 1 | — | 1 | 4 |
| 13 | — | 5 | 5 | — |
| 14 | — | — | — | — |

If we apply the TF/IDF algorithm and then cosine similarity functions above to the entire set of articles, both rated (Table 4) and new (Table 5), the result is the values listed in Table 7.

TABLE 7

| Article | IRP (pos) |
|---------|-----------|
| 1 | 3.93 |
| 2 | 4.19 |
| 3 | 4.84 |
| 4 | 4.23 |
| 5 | 3.18 |
| 6 | 4.58 |
| 7 | 3.21 |
| 8 | 2.31 |
| 9 | 3.01 |
| 10 | 1.41 |
| 11 | 3.93 |
| 12 | 2.24 |
| 13 | 3.68 |
| 14 | 3.00 |

Here we can see the predicted rating (IRP(pos)) for each of the articles in the set. For the items not in the training set (11-14), these IRP values are combined with information from the collaborative filtering subsystem to generate a final rating predictor for the article, as described below.

32.     The user's feedback about or interaction with items (or lack thereof) provides an indicator of how well the user liked each one. In the vector space model, the user profile would then be modified based on that feedback.  For example, if the user dislikes a newspaper article about last Sunday's football game, despite the fact the he or she is predicted to like it, the system would see that the article has a high weight for the term "Patriots", and then lower the user profile's weight for that term, so that fewer stories mentioning the name of the team would be likely to be recommended in the future. One way to think of this process is that after the item gets rated, the item is added to the training set that generates user profiles.  Of course, such an updating scheme is not perfect (perhaps the article was disliked because it was poorly written rather than because it mentioned the Patriots) but it has been found to work well enough in practice that such updating was a common feature of content-based filtering systems.

33.     Not all content-based information filtering and retrieval systems relied on the vector space model.  Another commonly used approach was the probabilistic model described by Belkin and Croft.[22]  Again, profiles were represented based on terms or other characteristics.  To represent an item, numeric values were assigned to each of the characteristics, with the values interpreted not as weights but as conditional probabilities.  To represent a user profile, numeric values were also assigned to each of the characteristics, again indicating conditional probabilities.  To compare an item profile and a user profile, the individual probabilities would be combined to compute an overall probability that the user will like the item.  As with similarity scores in the vector space model, the best matches (highest probability scores) were selected. After determining whether a user actually liked a particular item, the user profile's conditional probabilities for characteristics would be updated.

---

[22]      *Belkin and Croft* at p. 32 (describing that "[t]he three major alternatives are the Boolean, vector space and probabilistic retrieval models. The first of these is based on what is called the 'exact match' principle; the other two on the concept of 'best match.'")

34.     Other approaches are also possible, based, for example, on techniques from the fields of statistics or machine learning.  What all "best match" content-based filtering approaches had in common was: 1) some representation of both item and user profiles as lists of numeric values, with each value providing information about a specific characteristic; 2) A formula or algorithm for comparing an item profile and a user profile to determine a score for the pairing; and 3) A way to modify the numeric values in the user profiles based on the item profiles of the items the user liked and/or disliked. Approaches would differ in their choices of underlying characteristics, in how the numeric values in profiles were to be interpreted, and in formulas for comparing profiles, and for updating customer profiles.  However, all approaches required numerical representations of both the item's content or characteristics and the user's interests.

### 2.   Collaborative filtering

35.     While content-based filtering and retrieval systems were successful, by the late 1980s the technology was mature and performance improvements were increasingly hard to obtain. Collaborative filtering takes a quite different approach to selecting items for people. It works directly from data about people's likes and dislikes for specific items, without relying on representing either items or people in terms of descriptive characteristics.   "Tokens" or "terms" representing the item's content are not needed to predict a user's interest.  By the mid 1990s, collaborative filtering (sometimes then called social filtering, and later called recommender systems) was widely viewed in the field as a promising approach.[23]

---

[23]     Malone et al, *Intelligent information sharing systems*, Comm. ACM, vol. 30, no. 5, p. 390 (May, 1987); David Goldberg, et. al, *Using collaborative filtering to weave an information tapestry*, Comm. ACM., vol. 32, no. 12, p. 61 (Dec. 1992); D.B. Terry, *A tour through Tapestry*, in Proceeding of the ACM Conference on Organizational Computing Systems, p. 21-30 (November 1993);Resnick, P., Iacovou, N., Sushak, M., Bergstrom, P., and Riedl, J. *GroupLens: An open architecture for collaborative filtering of netnews*. Proceedings of the 1994 Computer Supported Collaborative Work Conference (1994); David Maltz, *Distributing information for collaborative filtering of Usenet Net News*, M.S. Thesis, M.I.T. (May, 1994); Mitesh Suchak, *GoodNews:  A collaborative filter for network news*, S.B and M.S. Thesis, M.I.T. (February, 1994).

36.    Not requiring any representation of an item's contents or a user's preferences in terms of underlying characteristics is a fundamentally distinguishing feature of collaborative filtering.  It can be difficult to capture the essence of an item or a user's preferences with a set of characteristics.  Moreover, two items of similar content may not be equally desirable. In the collaborative approach, the subjective nature of the reasons why people like or dislike items, such as movies, books, etc., even when they have very similar content, forms the basis for the recommendations.  In practice, this approach has proven to be very effective.

37.    Two basic approaches to collaborative filtering were known at the time of filing of the Patents-in-Suit. The first method, later dubbed the "user-to-user" approach, identifies users with similar tastes (i.e., they liked the same things in the past), and suggests an item to a user if users with similar tastes have already tried it and liked it.  One technique for identifying users with similar tastes is to calculate a "correlation coefficient" for ratings from each pair of users.[24]

38.    The second approach, later dubbed the "item-to-item" approach, is the mirror image of the first.  It starts with an item that a user is known to like and finds other items that are similar in desirability to it (i.e., they tended in the past to be liked by the users who liked the current item).  Again, commonly a statistical correlation coefficient or cosine measure is used to measure similarity.

### C.  The Patents-in-Suit

39.    The '799 and the '214 Patents are respectively entitled "Information System and Method for Filtering a Massive Flow of Information Entities to Meet User Information Classification Needs"  and "System and Method Employing Individual User Content-based Data and User Collaborative Feedback Data to Evaluate the Content of an Information Entity in a Large

---

[24]    *GroupLens* at 181.

DECL. OF DR. PAUL RESNICK ISO NETFLIX'S
MTN. FOR SUMMARY JUDGMENT OF NONINFRINGMENT
CASE NO. 1:07CV11469 MLW

Information Communication Network." As the titles indicate, these patents describe techniques for filtering information entities in large-scale systems.[25]



40.    Figure 1 of these patents (shown above) generally shows how the systems of these patents operate. A stream of data, representing information that may be of use to a user is received through the network by the information filter.[26] Information entities, or "informons" in the language of the patent[27] are extracted from the data stream.[28] In the preferred embodiment, the raw information entities are internally represented as a vector of numeric values.[29]

41.    The extracted informons are filtered through an Adaptive Filter Means. Collaborative filters (or "Community Filters" in Figure 1) and content-based filters (or "User Filters" in Figure 1) each produce predicted ratings. The outputs of these filters are combined using weighted

---

[25]    *See, e.g.,* '799 Patent, Abstract.

[26]    *See, e.g.,* '214 Patent at col. 6:35-55, 11:34-44.

[27]    *See* '799 Patent at col. 7:1-2.

[28]    *See, e.g.,* '214 Patent at col.3:13-15.

[29]    *See, e.g., id.* at col. 6:17-19. *See also, id.* at col. 8:38-54.

averaging or some other function to produce a final prediction about how well the user will like the informons. The predictions are used to determine whether the information entity should be presented to the user as a candidate for inspection.

42.    Finally, once an information entity has been presented to the user, the user's actual assessment of the value of the information entity is used to see how accurate the system was, and to update the content and collaboration-based profiles so as to improve future filtering and the relative weight given to the content and collaborative filters.[30]  If the user disliked the information entity, the values in the user's content profile that represent the tokens found in the information entity will be adjusted down.  Similarly, the user's rating of the information entity changes how the collaborative filter makes predictions about what people will like.

### D.  Interpretation of claim terms from the Patents-in-suit

43.    The methods and systems described in the Patents-in-suit are readily recognizable to persons of ordinary skill in information filtering as fitting into the framework of content-based and collaborative information filtering.  The Patents-in-suit describe concepts and systems from the information filtering field; nomenclature in the patents should be understood in this context.

#### 1.  "informon"

44.    In the context of information filtering approaches, the recitation in the asserted claims of "informon" clearly would have been understood as "an information entity."  The term "informon" is not a commonly used term in the field but it is specifically defined as "an information entity" in the specification of each of the Patents-in-suit.[31]  The term "information

---

[30]    *See* '799 Patent at col. 14:3-61.

[31]    *See id.* at 3:35-36 ("in which entities of information relevant to the user, or 'informons,' are extracted"); '214 Patent, col.1:17-18 ("determining the value of a document or other information entity (informon)").

entity" would be known and understood by those of skill in the art. The term "informon" is used in a context identical to the context in which "information entity" is typically used in the field.

2. "determine a value" / "generating an output rating predictor"

45.    In the context of information filtering approaches, the recitation in this claim element of "determine a value" or "generating an output rating predictor" would have been understood as producing a numeric value. As noted above, the patent describes using TF-IDF and MDL models for matching profiles of "informons" to user ratings.[32] These models are mathematical and derive their results quantitatively. Similarly, the patent describes collaborative filtering techniques that produce numeric predictions of users' ratings for items. Furthermore, throughout the specification, where reference is made to profile representation or adaptation models, it is by reference to techniques that contemplate only quantitative representations and values.[33] A rating predictor, in the terminology of the patents, is clearly a number. Indeed, the patent describes rating predictors as numbers falling in the same range as the ratings users can enter.[34] The value produced by combining the information profile data, the content profile data, and the collaboration data is also clearly a number, because the "combination function 427a-d can be from a simple, weighted, additive function to a far more complex neural network function."[35] One of ordinary skill in the art would know that the outputs of such functions are numeric values. Thus, in the context of these patents, one of ordinary skill in the art of information filtering would understand that the result of combining the informon profile data, content profile data, and collaboration data would be a numeric result. Similarly, the combination of content-based and

---

[32]        *See* '799 Patent, col. 12:55-13:10.

[33]        *See, e.g.,* '799 Patent col. 21:12-27:14; *see also,* 13:12–14 ("[C]ompute a linear regression from rating community similarities to continuous rating predictions"); col. 25:56–61 (A neural network could be used to learn how to compare profiles so that the error in predicted ratings is minimized. However, the invention can be embodied with use of a simple cosine similarity metric . . . ").

[34]        *See* '799 Patent, col. 21:37-39, 23:54-60.

collaboration-based value functions as described in the '214 patent would also be a numeric result.  The person of ordinary skill would understand this process to mean "calculating a number based on the combined content and collaboration data."

---

[35]     *See* '799 Patent, col. 21:30-32.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Respectfully Submitted,


/s/ *Paul Resnick*
Paul Resnick
214 Buena Vista
Ann Arbor, MI 48103

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2008, a true copy of the above document was served upon the attorney of record for each party by hand.

/s/ Benjamin L. Mack
Benjamin L. Mack